The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez! Oyez! Oyez! All persons have any manner or form of business before the Honorable. The United States Court of Appeals for the 4th Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, please be seated. We are ready for argument in our first case. Ms. Logan Harrison, when you're ready. Thank you, may it please the Court. I'm Patricia Logan Harrison and I represent two severely disabled Medicaid beneficiaries, Robert Levin and Richard Stogsdill in this case. Medicaid is a health insurance program for persons who are very poor and the programs at issue in this case, the Head and Spinal Cord Injury Program and the Intellectual Disability Related Disabilities Program, are the most disabled of the disabled. So in order to qualify for these programs, individuals have to meet institutional level care. Richard Stogsdill meets an intermediate level of care and Rob Levin meets a more severe standard requiring skilled level of care. Rob Levin has to be suctioned throughout the day and he has to be tube fed seven times a day. I think we probably have a background in just the basic facts of it. You've got an awful lot of issues here so you may want to just move on to start into your legal argument. Yes, sir. Let me first address the due process issue and certainly if there's questions the panel has, I welcome those, what you think is more important. Medicaid is a complicated program, there's no doubt about that, but the fair hearing regulations that are set forth at 42 CFR 431-200 through 244, they're really very simple. They require that when the state does not, when they reduce, deny or when they do not provide services with reasonable promptness to provide a hearing, I'm sorry, to provide a notice and that notice has to contain certain things. The notice has to give you the reason and it has to give you the statute so that until you have that foundational notice, there's no way for my people to prepare for a hearing. So one of our issues in this case is that there is not a single notice in the record that meets those requirements. So then those regulations, I'm sorry, Judge Duncan, do you have a question? I would like at some point you to circle back and talk to us a few minutes about abstentions. Okay. That was going to be my second issue, but certainly I'll jump to that first. No, no, please. Proceed in the order that you had planned. Okay. I just was letting you know that at some point I would like. Absolutely, Your Honor. Can I put in a request too? I would also like, I'm not sure I understand the gist of the claim as to Mr. Levin under the waiver participants, protection of waiver participants provision. I'd like you to talk about that briefly too. Okay. Getting back to the due process issue, the regulations provide not only that you have to comply with these regulations, but also you have to have all the protections that Goldberg provides, which includes an opportunity to present your case orally. This is a claim as to Mr. Levin or Mr. Stogstill or both? Both of them. Both of them. And I'd bring out, Your Honor, that they bring this in their role as private attorney general. So this is a systemic problem. Am I right that the South Carolina Court of Appeals has ruled on this issue as far as Mr. Stogstill is concerned? The Court of Appeals ruled that Mr. Stogstill was given whatever due process right he was entitled to because he appeared at a hearing. The only notice in the record is that he was. Well, was that issue before the South Carolina Court of Appeals? That issue was before the South Carolina Court of Appeals, and they did rule on that. It has gone all the way up to the U.S. Supreme Court, and they have denied cert on that issue. Yes, sir. As to Mr. Levin, I thought that the district court held that he didn't avail himself of his administrative hearing rights after the 2010 cuts because he thought they were futile and that thinking something is futile isn't sort of an excuse or not exhausting, so that takes care of his due process claim. He had a right to a hearing, and he chose to forego it. Well, what happened was that the families were told that there was no right to a hearing, and the obligation I thought he said the reason I didn't pursue a hearing is because I thought it would be futile, not because I didn't think I had that opportunity. Well, I think there's an affidavit saying that families were told it was statewide. The district court made a factual error, you think, when the district court said the reason that he didn't pursue a hearing was through this futility excuse. Well, and there's also the futility excuse.  So at that point he had standing because he had right to a notice that gave him the reasons, and the reasons that were given to families was that there was no money. And is that in the record, that families were told that there was no appeal? I believe it is. I believe it's in an affidavit. I do so many of these, I know it's in the affidavit. I completely understand. And perhaps when you sit down for rebuttal it would help me, because I was under the impression that I think Judge Harris is that he did not seek reconsideration. And see, the point is the standing occurred at the moment when they had Because it's not really a standing inquiry. Okay. It's just a question of whether he availed himself of the opportunity to review the determination. The notice triggers that obligation. And didn't the district, I am working from memory, like you, I have a lot of cases, so tell me if I'm getting this wrong. I thought the district court sort of acknowledged there may have been a bit of a notice issue, but now, I mean, at the point at which he decided not to pursue the hearing, Mr. Levin did have notice. The notice issues have been cured. They're not recurring. It's not a problem anymore. So why are The only evidence in the record that it's been cured is Mr. Widorczyk's statement. There's no notice in the record that complies. And indeed But it was beside the point. It was moot as to Mr. Levin, who knew he had this hearing right and chose not to go through it because of the futility. Because what tells him he has that right is the notice that was never given to him. And then since then, repeated But that's a little bit different from saying that he was told that there was no appeal, which is what concerns me. And I will check on that, Judge Duncan. I know that's what families were told. And the issue is That's a factual issue, and I'm not aware there being a finding on that, nor it seems like to me the issue would be you would have to have argued that the district court made a clearly erroneous finding of fact to arrive at that point, which I'm not remembering that that claim was made. And what we've said is that this is repetitive. It's ongoing. And, in fact, we clearly Their conditions declined over the two years. And then in 2014, we asked for nursing. And the court dismissed under rightness Levin's request for nursing. But here again, the trigger was the state had the obligation. When they did not provide those services with reasonable promptness, they had the obligation to provide the written notice containing the reasons and the statute so that we could prepare for a hearing. So Mr. Wodorczyk has said they cured it. But the fact that there is no notice from the request in 214 What would be your relief on this issue? To mandate that the court provide notices meeting those requirements, because what happens is over and over and over to go back through the administrative process now? Well, to require that the state comply with these very simple requirements. And that advances matters how? Because there is no due process in South Carolina. There aren't hearings held where you have a right to present evidence, to cross-examine the witnesses, and to have a hearing within 90 days. What we've seen in Stogstall, who filed his appeal in 2009, what we've seen in Waddell, who filed her appeal in 2007, what we've seen in Doe is these cases go on for years without there being a final decision. But Waddell and Doe, are they parties here? They are not parties here, but we brought this. These individuals brought these claims in their role as private attorney general. And it is a systemic problem. Waddell and Doe show that it's going on, that there is no due process. There is no fair hearing process. These cases take years before you even get to the judicial branch. As time is fleeting away, I also would be very interested in your response on the abstention issue. Yes, sir. Let me move to abstention. The purpose of 1983 and the Ku Klux Klan Act was to give people relief when there's no relief available in the state courts. That was the whole purpose. Stock still filed his lawsuit in 2009, February 2009. Can you just tell us directly why you say the district court abused its discretion or erred with regard to its holdings on abstention? Okay. As to the Rooker-Feldman issue, there was no state decision. That was the problem. It was still in the administrative proceedings when we filed this case. There was no state court decision until September 2014. As to the Colorado River issue, we have in Doe v. Kidd, the hearing officer said, even after this court in 2011 said DDSN and HHS, you have violated your duty to provide services with reasonable promptness.  Just to sort of move this along perhaps, the critical issue, it seems to me, in Colorado River abstention, as I understand it, is whether or not there are parallel state proceedings. And the district court felt that because this is a very complex state administrative process, that it made sense to allow the state administrative process to address what is essentially the state issue of the reduction of state services. Why was that an abuse of discretion? It's an abuse of discretion, Your Honor, because there's no ruling on the violation of 1396-AA-8, the reasonable promptness. Does there have to be a ruling if the suits are parallel? Does there have to be a state ruling if the state administrative process was at least farther along? Was it not? I think it was. Then when the federal lawsuit was filed, the state administrative process had been going on. Without resolution. I'm not talking about resolution. I'm talking about the process, the suits. But, Your Honor, there is noóthey have repeatedly said, we don't have jurisdiction to rule on reasonable promptness. That's an issue in Doe v. Kidd, and that's an issue over and over. You have a right to receive services with reasonable promptness. Doe v. Kidd, that's what this court said. And they have said, we do not have jurisdiction over that. You're really not addressing my question. Perhaps you couldóJudge Harris had a question as well, I think, that you were asking. Oh, I did, but I'm happy to talk more. I've got some specific abstention questions. Okay, sorry. Yeah, no, let's write whatever. I have an abstention question. Oh, please. Do you agree that these are parallel claims? No, I don't, because they're different parties. The mothers here have also brought claims. There is noó Because they're having to give up their careers, and they have a loss also, because the state isó Are they seeking the same relief? They are seeking the same relief. It's a different part of the problem, seeking relief of the same problem. But there is no relief in the state administrative process for reasonable promptness, oró I just said that there had been no resolution. Right, but there is no state court decision in South Carolina. And in Doe v. Kidd, the hearing officer said we don't have jurisdiction over reasonable promptness, the Doe v. Kidd issue. I thought you were bringing Federal claims in the Federal action that were notómaybe we're saying the same thingó that were not being released in the state administrative proceedings. We have tried to bring reasonable promptness claims. I don'tóyou're bringing claims under the Medicaid Act and retaliation claims in the Federal suit that I understood you were not raising in the state proceeding, perhaps because you can't. There's no jurisdiction over them. Is that correct? The ADA retaliation was never raised in the state proceedings. Okay. Anything else? And also, we raisedóthe hearing in the state proceedings was 2010. So it only coveredóthe record was closed, and it only covered violations through 2010. Our Federal proceeding covered violations from 2010 until it was filed, and ongoing violations, which were not part of the state proceedings, because they continued to violate. Ms. Harrison, your time has expired, but Judge Agee has a question. Please respond to it. It continues along the abstention line. The district court, with regard to Mr. Stockstill, as I understand it, ruled in the alternative as to the court's reasons for abstaining. So you've covered Colorado River and Rooker-Feldman. They also said he was abstaining under Burford. They also said I'm abstaining under the Declaratory Judgment Act. So you have four different bases in the alternative, which would require you to rebut each one. So I'm looking at your brief with regard to the Declaratory Judgment Act claim on page 28. There's one sentence that I think arguably could be said to address the declaratory judgment rationale for abstention. And my question is whether or not, under our rules and case law, that's sufficient to have raised the issue. Your Honor, there were so many issues to address in this case that we were very limited in how much time we could spend on each one. But we, in good faith, attempted to address each issue. Are you saying that you sufficiently put it in play to escape waiver? I think that's the question. Yes, Your Honor. I mean, it wasn't like that was the only issue. We had a number of issues, and we attempted to do that. All right. Thank you. Thank you. You have some time for rebuttal. Mr. Wodarczyk, did I pronounce that correctly? Your Honor, yes, ma'am. Thank you. Ma'am, please. Just so we don't lose the thread, can I ask one question about just what we were talking about, about the Declaratory Judgment Act? I think this is Mr. Wodarczyk representing the state of South Carolina. Yeah, yeah, yeah. Yeah, I was just trying to get that out. I'm so sorry. I was so scared I would lose the thread of just exactly what we've been talking about. And I'm sorry to interrupt. Are you arguing that the district court properly abstained under the Declaratory Judgment Act? I sort of had the sense that you were not, that you agree now that if the plaintiff is seeking injunctive relief, then Colorado River governs, and we don't. We addressed all the arguments, Your Honor. We believe that the district court ruled in each respect. Some may be stronger than others, but with regards to the Declaratory Judgment Act, I think Ms. Harrison alleged that she was seeking both declaratory and nondeclaratory relief. That was the extent of the argument. I think we raised that that didn't preserve the issue for an appellate argument. In going back, looking through these. So you argued that as far as that ground for the district court's decision that she has waived it? We argued in our brief that none of the issues were properly argued. I think she spent more time in the response brief addressing it. Has she waived it or not? We argued that it was waived, but then went ahead to address the merits of the issues in our brief, Your Honor. And on the merits, do you think the district court was right, given that she was seeking injunctive relief to abstain under the Declaratory Judgment Act? I do, Your Honor. I believe that. You do? I thought we made that pretty clear. What is the name of that case? Von Rosenberg. I understand that. And I just believe that the entire action was seeking a declaratory judgment. The relief all stems from declaring the rights and responsibilities of the parties. That's exactly what we're seeking here. Truly, it was captioned an action for injunctive relief, but there's really no enjoining of doing anything. What was asked in the prayer for relief to the Second Amendment complaint was specific prospective acts on behalf of the court, Your Honor. So that is my position as we argue that we don't believe, that we do believe that it was proper in part to not address, and I believe that the Declaratory Act issue is discretionary with the court versus the other issues of abstention that was raised. Shall I go on with the abstention, Your Honors, or how would you like to handle this? Please proceed. I'm here for the pleasure of the court. Right ahead. Initially, I wanted to address the cross-appeal that was raised by my client. We allege the district court erred in finding that the department violated the Feasible Alternatives Provision of the Medicaid Act. Specifically, the Feasible Alternatives Provision requires that. I didn't realize you were going to insist on that. It's my mistake that you were going into the cross-appeal. Why don't we go back. Let's talk a little bit about the Colorado River abstention. Yes, sir. Is it your position that there are parallel proceedings here? Absolutely, Your Honor. Many of the issues, I would not say all of the issues, most of the issues raised in the state proceeding, either addressed or footnoted by the Court of Appeals, were raised in this action. I would note that one of the issues was deference to treating providers in the state issue. There was a footnote in the state Court of Appeals that said, because we're finding that the reduction in services was unconstitutional and we're remanding, we don't have to address this issue. Even though it wasn't specifically addressed by the court because it was not needed, those issues were raised. I don't believe that the standards of the Colorado River doctrine require exact mimicking, exact parties. I think it states that they should be substantially the same parties, and I think it states that there should be substantially the same issues. Obviously, if there was an intent to make it exactly the same, that language would be used. Can I ask on Colorado River how you would distinguish our decision in Chase-Brexton where we reversed a district court that had abstained under Colorado River in a Medicaid case, saying, look, this is a federal law question, which is a factor the district court did not mention in its opinion. That key factor, this is all about federal law, we're applying the Federal Medicaid Act, the state process is slow, and I think we can agree the state process is slow in this case as well. So how do we distinguish that case? I think just factually in this particular issue, when we were arguing before the court on these various issues, the abstention arguments weren't raised by the parties. They were sui sponte by the court when they issued the summary judgment order. There had already been an order issued. The Court of Appeals had issued its September 2014 order. There was some indication that there may be appeals. Harrison did, in fact, appeal. The department did not appeal the Court of Appeals ruling, and the court specifically noted that. When was this suit filed on behalf of Stodgetall and Levin? The second amended complaint was in January 2, 2014. The initial suit was in 2012. The reason I ask that is if I'm remembering this correctly, which highly likely I'm not, there was a lower court proceeding in South Carolina, some sort of an administrative court. Administrative appeal process. Had that proceeding already commenced before the complaint was filed in this case? Yes, my understanding is the initial challenge to the reduction in services occurred in 2009. That went through the fair hearing process. Then it went through the Administrative Law Court. Then that was appealed to the Court of Appeals. Then to the South Carolina Supreme Court, which withdrew its petition. So the complaint in this case was filed between the decision of the administrative court and the proceeding in the South Carolina Court of Appeals? Specifically, Your Honor, I'm not sure of the exact timing. If there had been an ALC appeal issued on that one, I'm not sure. It's actually raised in our brief. You all can figure that out or somebody can figure it out. I do know that the state appeal began first and that the Court of Appeals issued what ultimately became its final order before the court issued its order stating that it was abstaining on that matter. Which I think in looking at it and looking at the totality, any one of those reasons would be sufficient. The court obviously can affirm under any of those grounds. Specifically, I think what the court's concern was is that there's already an issue. I mean, there's already an order issued by the Court of Appeals which the district court said was enforceable, and it is enforceable. It found that the department had violated Olmstead, the integration mandate by these reductions in services, as to Mr. Stocksdale. It said that you would have to go back and evaluate for him for services without regards to the caps. It addressed the due process claims. It addressed the notice problems. There's obviously problems with that. We've always conceded that there were problems with the notice issues back in 2010. So I think what the district court's concern was, and rightfully so, is now we go and try this case anew, and what happens if the burden's not met? What if we issue, a district court issues an opinion that finds things that the state court didn't find? Wouldn't ordinary preclusion principles apply? I don't understand how that would happen. Collateral estoppel. I mean, isn't that the idea that the alternative to abstention is try the case and applying normal preclusion principles? One factor that I don't think it was addressed in the Court of Appeals opinion said that the state did not meet its burden of showing a fundamental alteration defense. The fact is the fundamental alteration defense was never tried at the administrative law court hearing. There was no action. Then maybe they're not parallel proceedings. And again, it does run in. Well, they are parallel. I think it would be our... I don't understand why just applying normal preclusion principles doesn't take care of this particular problem you're addressing. Again, Your Honor, it was our intent that if we did go forward on Mr. Stocksville's claim, a full trial, that the vast majority of the issues would deal with fundamental alteration. That was the same thing with Mr. Levin's case, which is why the court bifurcated the trial because the bulk of it, bringing in directors, bringing in financial evaluators, things along those lines, Director Kex, offered some compelling testimony as to fundamental alteration. But you had not raised a collateral estoppel or raised judicata issues in the district court to this point. There were none, I don't believe, Your Honor, at that point in time. Well, I thought the South Carolina Court of Appeals decision had been issued before the district court issued some of its opinions. Maybe not. This was cross motions for summary judgment, Your Honor, and I believe the court noted in its order that at the time that the briefs were submitted, there had not been a ruling on the Court of Appeals decision. It was pending. By the time that we had oral arguments, the court had, in fact, issued its September 2014 opinion, which then was appealed. This really is a somewhat odd procedural history because in the bench trial, the district court just essentially said it's too complicated to spend judicial resources on dealing with something that is essentially a state matter. I think that the court was wisely trying to avoid having any potential conflicting orders out there. I think the court looked at the fact that the South Carolina Court of Appeals had addressed the concerns of Mr. Stocksville that were being raised in the federal action, specifically with the Olmstead violation, specifically with the caps on services, specifically with promulgating regulations, failure to comply with the Administrative Procedures Act, all those things. That was the bulk of what these lawsuits were about. Could I get for a moment to your cross appeal, since that will be addressed in response as well? Yes, ma'am. Can I ask one question before we get to the cross appeal? Oh, I'm sorry. Go ahead. Am I right that in the federal suit, there's a retaliation cause of action? There were two claims for retaliation. Were they ever in the state court action? No, they were not in the state court action on this one. Are those claims before us now? Your Honor, I don't believe the retaliation prayer for relief was to issue an order stating that the department could not in the future retaliate against these individuals or third parties who provide services. I don't think, even in the testimony of it, there was one person who testified as to one or two people who lost their jobs. Did the district court rule on that? I don't believe that the district court issued a specific ruling with regard to retaliation off the top of my head, and I can't remember that. Is that still alive in the district? I'm just kind of lost as to where . . . I think I raised that as one of the issues that was not preserved in my brief here, Your Honor. I just want to . . . Did Mr. Levin have a retaliation claim as well? I thought that was only Stogsdill. It was both. Oh, Mr. Levin has one, too. I didn't know that. And the testimony with regard to Mr. Levin was that people . . . the people who were allegedly retaliated against were involved . . . were not involved with the HASKEY program, which is what Mr. Levin is under. They were involved with the IDRD program, which is what Mr. Stogsdill was actually involved in. I think you've answered my question. Okay. I have one last question about abstention before we move on. Just for clarification's sake, are you saying that you briefed on the merits of this declaratory judgment point? Because I'm just looking at your brief, and I see that you briefed the other three. You defended Burford, Colorado River, and Rucker-Feldman, but I don't see you defending declaratory . . . That's why I thought perhaps you guys were actually in agreement on that. And, Your Honor, I apologize if I decided something that wasn't in my brief. I prepared for it. Okay. I think maybe both of you made this point, but okay. I did think that it was in the brief, but the retaliation claim is on page 53 of my brief, and I do indicate that I don't believe that there was any findings of fact or conclusions of law regarding that claim. Regarding the cross-appeal, Your Honor, we believe that simply the district court took the enabling language of the Social Security Act and took it a step too far with regards to the department's duty to inform participants of feasible alternatives. So you don't believe that the provision requires states to inform eligible participants of alternatives under the waiver program? I do believe they do that. I think my client believes. The problem is that it's really a three-part test under the regulation and the statute. One, you have to determine if they're likely to require a service in the ICF or the intermediate care facility, which is what these individuals would go to. I believe it's a nursing home or hospital. If you discover that they're going to need these types of services, then you have to offer them the alternatives, if there are any, that are feasible to allow them to stay at home. And then after you do that, the participant gets to choose. And while I would agree that the purpose, as the district court stated, of this act is to keep people out of institutions, and while I would agree that if there is some evidence that would put either the case manager, obviously it always deals with the case manager, it gets filtered up through the principal agency issue, to say, I see something that should put me on notice or make me aware that they may need certain services that would be available in the ICF. It sounds to me as though what you are articulating is a kind of harmless error standard. Yes, there is a requirement that you inform potentially eligible participants of this availability, or at least if in your determination it's warranted. But the fact that you didn't do so here doesn't matter because there was not a reasonable alternative? Is that what you're saying? My argument here, Your Honor, is that there was no evidence that would give anybody any reason to believe any other services other than what was already provided would be needed. And just one more, to follow up on that, how does one know that from the regulation that the determination is solely within the purview of the state to trigger the requirement of being informed of feasible alternatives? Well, the regulation puts the burden on the state entity that administers Medicare. Yes. What it states is that, I think the language is, if the individual is determined to be likely to require the level of care provided in this facility, then you have to offer feasible alternatives. And had there been any evidence that Mr. Levin would have required some additional services, then you could have. But how can it be that once there's been a big cut in services? I mean, I'm sort of understanding. I thought I understood your argument that it can't be that every single day you have to just keep notifying the same person of the same thing. But after an across-the-board cut in services, isn't that enough to put the state on notice? Some people may need to start thinking about alternatives. This would be the time to tell people, we're cutting down on your hours on personal care, but here's an alternative. That just seems, on your own theory, is there any evidence that someone might need an alternative? Why isn't it obvious that when you're cutting back on one of the services you're providing, they may need an alternative? I think that, and Martin Prosser ran the problem with the entire program, is that they were cutting all the services down. Mr. Levin just happened to only receive a small number as compared to others, like, for example, Mr. Stogsdale. There was a mixing if, for example, they increased respite, availability of respite care to, I think, up towards 240 hours a month in some circumstances. Some people could get that. But they were cutting services that they were receiving hands-on care, which is normally referred to as attendant care like Mr. Levin gets, or personal care 1 or personal care 2. They were reducing those and trying to compensate with what essentially was not equivalent care. In this particular situation, you would be cutting a lesser service, and if you go with nursing service, you're providing a greater. . . Well, that seems like a good alternative to inform people about. Well, I don't think that there was any. . . Let me back up to state what's in the record, Your Honor. Any increase of nursing services, any providing of nursing services, you reduce the attendant care services. It's in the record. Dr. Bellier testified that. So it's not like you get 14 hours of nursing and you keep 49 hours of respite care. Your respite care should drop in order to get the nursing. So you're really not getting increased services or alternative services. You're just switching out the type of services to keep you in the situation that you're in. Are you saying perhaps that you could not notify people on an individualized basis of how the changes would affect them? I'm trying to sort of. . . I thought I understood your argument earlier on, but I think it's getting murkier. It's getting a little muddled. I don't think that the nursing services have anything to do with the 2010 reductions. The 2010 reductions were by 7 hours. The nursing services came years later. I think the first order for nursing services came in 2014. The problem is that twice a year the case manager meets with Ms. Self, with the caregivers, with the participant, and there's no problems. There's no discussions of any problems. There's no complaints. There's no medical problems. There's no ulcers. He's very well cared of. I mean, it's a tribute. I think I'm over by two minutes now. I can just use my rebuttal if you would like to do that. Well, I think there's a question on the table, although I forget whose. If you could just finish your thought quickly. The point being, and the point of my argument, is that throughout these years, every meeting there's no problems. The doctor doesn't have any problems. And then the court steps in later after the fact and says, even though you don't have an obligation to inform the participant of every service, you should have told her about nursing services because she testified that would have been helpful. I don't think that you can open that up to the agency, broad spectrum, because what it does is requires the agency to tell every single service, every single time, that could be available in hopes that that person would say, I may like this one, I may need this one, please help me out. So that is the crux of my argument, Your Honor, and my time has expired. Thank you. Your Honor, something that may help bring some clarification here, is that in the state proceedings in South Carolina now, okay, in the state proceedings, the rule is that they don't have to comply with federal law. In Stogstall, what the court said is that the contract that HHS has with CMS overrides federal law. They reiterated that in Joseph versus, it's a recent case in the South Carolina Supreme Court, Joseph versus the South Carolina Department of Labor License and Review. The rule in South Carolina is what controls is not the federal law. What controls is the state's document that was prepared with, by agreement between a few people at HHS and a few people at CMS in Atlanta. Could you perhaps tell me what this argument is going to? This is going to the abstention argument that it's exactly what we had in the Ku Klux Klan Act. There is no relief that could ever be offered because they've said you don't get relief for reasonable promptness, you don't get relief for due process. In Joseph versus Department of Labor License and Review, the South Carolina Supreme Court said federal law was superseded by this contract that HHS makes with, so there's no use in us going back through the federal law. What does this have to do with abstention now? I'm kind of lost. Well, there is no remedy. So it's exactly like Doe v. Kidd, where this court- There's no remedy in the state court which makes the claims not parallel? Right. And in this court, the Judges Gregory and his panel twice looked at this and said there's not a process, a state administrative process is not sufficiently built to provide a relief for reasonable promptness. That's what we have now, and it's frightening, the decision in Joseph, that our state Supreme Court has said that federal law doesn't apply if HHS gets together with Atlanta CMS and whatever they agree to is law in South Carolina. Your Honor, as to the Colorado River again, the slow process that they discuss in Chase, Stogstall filed an appeal in 2009, went through the whole process, they remanded it and said you have to assess him. It didn't happen. Then he went through the process in 2010, went through 2014, they remanded it, and it still didn't happen. So there is no relief there. As to the retaliation, Your Honor, these plaintiffs bring this in their role as private attorney general, and throughout we have affidavits showing that there is systemic retaliation, which was not addressed. Did the district court rule on that? The district court totally ignored that issue. We filed a motion to reconsider, but they totally ignored that issue. So there's no, I'm trying to figure out where that claim is now. Because if the district court has never ruled on it, tell me what it is we're reviewing now. Well, the district court totally threw out all the claims of Stogstall, and Stogstall has affidavits saying there is retaliation that Stogstall was retaliated against. And the district court threw all of his claims out. What was the basis that the district court used to dismiss or grant judgment as to the retaliation claim? There was no basis. The district court never ruled on it. We asked the district court to. Is that still before the district court?  Didn't the South Carolina Court of Appeals address Stogdill's ADA claim? And that's something else I'd like to mention in my short time, is that they did deal with a fundamental alteration issue, and they said that the state failed to prove that there was a fundamental alteration. The state said that they violated the ADA, that if you're at risk of institutionalization that Stogstall was, you can't apply the caps. But the state continues to apply the caps, the state, so that there was a ruling that it was violated, but here again, because there is no reasonable promptness relief in South Carolina, it doesn't matter because you just get sent back through that administrative appeals process so that it goes nowhere. Has Stogdill himself gotten the services? He has not gotten the nursing services. Well, he's gotten 14 out of the 56 hours that the doctor ordered, but there still has been no notice on meeting the criteria of 431.210. Although he must be aware that services have been reduced. What would the notice say to you? If you can't get relief in South Carolina under reasonable promptness, what would the notice say that would help you? You apparently have a state court determination that DHHS violated the ADA, but you're saying that nothing changed. So if that's the case, how does notice advance anything? Very importantly, because when you have notice, you know what the issues would be. Our notice said in the hearing in 2010, the notice said services were terminated because he moved out of state. So we go to a hearing where we've prepared for the reason provided in the notice, and there's an absolutely different reason that we've not brought witnesses for, and that happens over and over. They're bringing this as private attorney generals over and over. Because the reasons and the statutes are not provided in the notices, we go to these hearings. And your relief is to get more notices. The relief is to get notices providing the reasons for the change. And very importantly, Judge Duncan, notices need to be provided when services are not provided with promptness. That's what the code says is when you don't provide services promptly, you get a notice. So in this case, when we asked for nursing in 2014, both clients asked for nursing in the summer of 2014, if we had gotten a notice saying the reason that you're not getting nursing services is X, Y, Z, and if we had gone to a hearing where we knew what the reasons were and they were required to provide a final state decision within 90 days, we would have due process. But what happened is we asked for the services, they didn't give them to us, they didn't give us the notices, even when they were ordered by the Court of Appeals to reassess him. Your time has run over. If I could just clarify one thing. On this retaliation thing, I understand where Stogstall's retaliation claim is dismissed under extension. Are you saying that Mr. Levin also raised a retaliation claim in his complaint on which the district court has yet to rule? Both of the ‑‑ Just Levin. Yes. They both brought that on behalf of themselves and others. And the district court has never ruled on it. Did the court rule on it? No. The court never addressed the ADA retaliation claims. Okay. Thank you. Mr. Rodarczyk, you actually have, I think, some rebuttal on your cross appeal, but we never really talked about your cross appeal. I do have a question. Okay. There is a question. Do you agree with this assessment that Mr. Levin had an ADA retaliation claim in his complaint on which the district court has not ruled? Is that correct? Yes. Well, that's a real problem, right? Because then why do we have a final order? I don't know if there was a specific ‑‑ there was no specific findings of fact regarding the retaliation claim. It would be under the ‑‑ Well, let's ask it this way. In the orders the district court has entered in this case, has the district court dismissed or entered judgment as to Mr. Levin's retaliation claim? The Department of Health and Human Services prevailed on all the issues with a judgment in its favor except for the reasonable, feasible alternatives. So is that a yes? Yeah. In terms of all the claims have either, by Mr. Stogsdale, were dismissed, summary judgment, abstention. By Mr. Levin, either after the first trial, which was the ADA and the rehabilitation claims, and then the second trial dismissed his 1983 claims under the Medicaid Act violations. Neither of those issues, neither of those orders, from my recollection and looking at my brief, I state that there were no specific findings of fact with regard to the retaliation claims. And no specific ‑‑ nowhere does the district court say, and I'm dismissing that claim. The state wins on the retaliation claim. I'm not going to ‑‑ I didn't find anything like that. That's why I thought Mr. Levin didn't have a retaliation claim. Okay. I believe all the claims were set forth in the amended complaint as to both individuals. They were not set forth as to each one, each person. So that would be correct. And I don't recall what the Rule 59 motion, if that did, in fact, bring that to the court's attention or not. But there was testimony taken at trial on the retaliation issue by Ms. Harrison. And if the court has any other questions, I'll be happy to sit down. Thank you very much. Thank you. We will come down, Greek Council, and proceed directly to the next case.
judges: Allyson K. Duncan, G. Steven Agee, Pamela A. Harris